1  JOSEPH ARTHUR ROBERTS (State Bar No. 156180)
   Law Office of J. Arthur Roberts
2  3345 Newport Blvd., Suite 213
   Newport Beach, CA  92663
3  Telephone:  (949) 675-9900
   Facsimile:  (888) 989-9309
4  Joe@JARLegal.com
   Attorney for Plaintiff DIANA L. KOSI
5
                    UNITED STATES BANKRUPTCY COURT
6                   NORTHERN DISTRICT OF CALIFORNIA
                          OAKLAND DIVISION
7
8  RE:                          )  Chapter 13
                                )
9  DIANA L. KOSI,               )  Case No.: 4:16-bk-40493
                     Debtor(s)  )
10 _____     )  Adv.Pro.Case No.:
                                )
11 DIANA L. KOSI,               )  COMPLAINT
                     Plaintiff, )
12                              )   1. OBJECTION TO CLAIM #2
   Vs.                          )      (WINDELER DEVELOPMENT
13                              )      GROUP, INC.)
   ROBERT FITZ-STEPHENS, an     )   2. NEGLIGENCE PER SE;
14 individual; WINDELER         )   3. NEGLIGENT
   DEVELOPMENT GROUP, INC., a   )      MISREPRESENTATION;
15 California corporation;  GLORIA ) 4. BREACH CONTRACTS;
   LITTMAN as Trustee of the    )   5. According to the proof
16 BYPASS TRUST OF D and G LITTMAN )
   TRUST; GORDON M. HINDS, an   )
17 individual; and DOES 1-10,   )
   inclusive,                   )       DEMAND FOR JURY TRIAL
18                              )
                     Defendants )
19                              )
                                )
20 _____
21
22      Plaintiff captioned above, by and through their attorney of

23 record, bring this action against defendants ROBERT FITZ-

24 STEPHENS, ("Fitz-Stephens"), WINDELER DEVELOPMENT GROUP,

25 INC.("Windeler"),  GLORIA LITTMAN as Trustee of the BYPASS TRUST

26 OF D and G LITTMAN TRUST ("Littman Trust"), GORDON M. HINDS

27 ("Hinds") and DOES 1-10, inclusive, (collectively "Defendants")

28

COMPLAINT

and allege the following on information and belief, except as to those allegations which pertain to the Plaintiff:

## INTRODUCTION

1.  DIANA L. KOSI (hereinafter, "Plaintiff" or "Debtor") believes and thereon alleges that this action is a core proceeding brought pursuant to 28 U.S. Code Section 157, as the action relates to the alleged claims of two secured creditors and counter-claims of the estate against those secured creditors.

2.  Jurisdiction exists under 28 U.S.C. Section 1334. Venue is proper under 28 U.S.C. 1409 (a). The District Court has generally referred these matters to the Bankruptcy Court for hearing pursuant to 28 U.S.C. 157 (a) and applicable United States District Court of California General Orders.

3.  Debtor owns and resides the subject a single family home jointly with her non-filing spouse, John Kosi. The property, commonly known as 3202 Ortega Avenue, Lafayette, CA 94549 (the "Property"), with an estimated value of $1.25 million. Three secured debts totaling $$683,886.34, and including undisputed property tax arrears of $8,886.34, are listed on Schedule D. Debtor has no debts other than those listed on Schedule D.

4.  ROBERT FITZ-STEPHENS, ("Fitz-Stephens"), is an individual residing in the State of California, licensed as a Broker by the California Bureau of Real Estate, subject to a "restricted" license following the entry of a Superior Court civil judgment related to consumer mortgage loan fraud.

5.  WINDELER DEVELOPMENT GROUP, INC. ("Windeler") is

COMPLAINT

scheduled as the junior deed of trust holder of the Property. Windeler is a single shareholder California corporation and the alleged alter-ego of Fitz-Stephens. Fitz-Stephens has filed Proof of Claim #2 on behalf of Windeler for $153,172.78.

6. GLORIA LITTMAN as Trustee of the BYPASS TRUST OF D and G LITTMAN TRUST ("Littman Trust"). The Littman Trust is scheduled as the senior deed of trust holder on the Property for the disputed amount of $530.000.00. No Proof of Claim has been filed to date.

7. GORDON M. HINDS ("Hinds") is an individual residing in the State of California, licensed as a Broker by the California Bureau of Real Estate and registered as a Mortgage Loan Originator. Hinds is Fitzstephen's partner and engaged in the business of originating residential home mortgages.

8. Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1 - 10 inclusive, and therefore sue these defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believe and based thereon alleges each of the fictitiously named defendants is responsible in some manner for the injuries to Plaintiff alleged herein and that such injuries as herein alleged were proximately caused by such defendants.

9. Plaintiff is informed and believes, and alleges thereon, that each Defendant is responsible in some manner for the occurrences alleged in the Complaint at all times mentioned and that Plaintiff's actual injuries were proximately caused by Defendants. Information regarding the actual extent of each Defendant's participation in the business practices alleged herein is within the sole and exclusive possession of

Defendants.

10.    Plaintiff is further informed and believes, and alleges thereon, that each Defendant was the agent, servant, representative, and/or employee of their co-defendants, and in doing the things hereinafter alleged was acting in the scope of their authority as agents, servants, representatives, family members and/or employees, and with the permission and consent of their co-defendants.

11.    Additionally, Plaintiff is informed and believe, and allege thereon, that each Defendant assisted, aided and abetted, adopted, ratified, approved, or condoned the actions of every other defendant and that each corporate Defendant, if any, was acting as the alter ego of the other in the acts alleged herein.

## STATEMENT OF FACTS

12.    Plaintiff hereby incorporates by reference the proceeding paragraphs as if the same were fully set forth.

13.    On February 25, 2016, Diana Kosi (the "Debtor") commenced this bankruptcy case by filing a voluntary petition under Chapter 13 of the Bankruptcy Code ("Code") prior to a Trustee Sale of her home scheduled for February 29, 2016 by the Littman Trust.

14.    Debtor and her husband have substantial equity in the Property, substantial income and no debts aside from those purportedly secured by the Property.

15.  Since the filing of this case, Debtor has retained a real estate broker, prepared the Property for market,

listed the Property for sale on the MLS, conducted open houses and is actively attempting to sell the Property.

16.  The property was originally purchased by Windeler as a "non-owner occupied" investment from the Littman Trust, on or about June 8, 2016.  The Property is subject to a $600,000.00 purchase money Promissory Note (EXHIBIT A) made by Defendant Windeler in favor of Gloria Littman as Trustee of the Littman Trust.  Per Section 14 of the Promissory Note, the "loan of funds evidenced by this Promissory Note was made and arranged by Robert Fitz-Stephens, ("Broker") within the meaning of article X V of the California Constitution and that Maker is paying Broker a commission for such services."  The Promissory Note was executed by "Maker" Robb Fitz-Stephens "President" of Windeler.

17.    At all times relevant, Fitz-Stephens held a re-instated "restricted" broker license. According to the California Bureau of Real Estate, Fitz-Stephens has a public record of discipline, license revocations and Superior Court jury findings of fraudulent practices *specifically related to consumer loan transactions*.

18.  Title V of P.L. 110-289, the *Secure and Fair Enforcement for Mortgage Licensing Act of 2008* ("SAFE Act"), was passed on July 30, 2008.  The SAFE Act is designed to enhance consumer protection and reduce fraud through the setting of minimum

COMPLAINT

standards for the licensing and registration of state-licensed
mortgage loan originators.

19.    The SAFE Act requires state-licensed MLOs to pass a written
qualified test, to complete pre-licensure education courses,
and to take annual continuing education courses. The SAFE Act
also requires all MLOs to submit fingerprints to the
Nationwide Mortgage Licensing System (NMLS) for submission to
the FBI for a criminal background check; and state-licensed
MLOs to provide authorization for NMLS to obtain an
independent credit report.

20.  Because of his history of engaging in consumer mortgage
fraud, Fitz-Stephens is disqualified to hold, and does not
hold, a Mortgage Loan Originator License Endorsement pursuant
to the provisions of the California Financial Code and the
SAFE Act.

After enactment of SAFE Act, the Property has subsequently
sold to Debtor and a consumer loan was arranged via a
"creative financing" method concocted by Windeler
President Robert Fitz-Stephens

21.     When plaintiff expressed interest in buying the
subject property, Fitz-Stephens represented himself as a
"loan broker" and "financing" expert who possessed
superior knowledge and experience in consumer mortgage
lending.

22.  Windeler, the Kosis and the Littman Trust, entered
executed the Amendment to Promissory Note and Deed of

Trust (EXHIBIT B), on or about March 28, 2010. Therein, the Kosis took title to the Property from Windeler, paid down and assumed the balance of the debt ($530,000.00) owed by Windeler to Littman and executed a "Straight Note" (EXHIBIT C) in favor of Windeler in the amount of $145, 000.00.

23. Pursuant to the Amendment, the Littman Trust note required interest only (reduced to 6%) payments and required a $530,000.00 balloon payment on July 1, 2014.

24. The $145,000.00 Straight Note in favor of Windeler required interest-only (6%) payments with a balloon payment due on June 1, 2015.

25. Fitz-Stephens agreed to arrange the "creative financing", draft and negotiate all financing aspects of the transaction on behalf of the Kosis and represented that he had an insider agency relationship with the Littman Trust and claimed to be an experienced loan expert.

26. At all times relevant, Plaintiff and her husband reasonably relied on Fitz-Stephen's and Hind's greater personal knowledge, education, experience, and capacity in the area of consumer home financing.

27. At all times relevant, Plaintiff and her husband reasonably relied upon Fitz-Stephen's and Hind's proclaimed expertise and believed Fitz-Stephen's was acting on their behalf in a fiduciary capacity.

28.   Fitz-Stephens agreed to subordinate the Windeler note
      to the Littman note to facilitate the 2010 transaction.
      In addition, Fitz-Stephens promised the Kosis that he
      arrange a subsequent refinance loan and promised that he
      would later subordinate the Windeler note to allow
      payoff of the Littman note before it fully matured.

29.   At all times relevant, Fitz-Stephens provided advice and
      represented both the Littman Trust and the Kosis in the
      transaction and all subsequent amendments.

30.   At no time did Fitz-Stephens or the Littman Trust
      provide Debtor with any of the consumer credit
      disclosures required by TILA, RESPA and California law
      prior to or after the consummation of this consumer
      credit transaction.

31.   Notwithstanding these licensing restrictions, Fitz-
      Stephens has regularly engaged in the business practice
      of arranging residential mortgages and receives
      compensation from other brokers, including Defendant
      Gordon Hinds.

32.   After taking title to the Property, the Kosis paid
      monthly payments to the Littman Trust and Windeler,
      through their designated servicer, Evergreen Loan
      Servicing.

*Broker Robert Fitz-Stephens and his agents engaged in unauthorized mortgage origination practices, breaches of fiduciary duty and conflicts of interest that prevented Plaintiff from refinancing the Littman mortgage and caused financial harm to Debtor and her spouse.*

33.    That at all times relevant, Fitz-Stephens maintained a fiduciary relationship with the Kosis even years after the initial sale of the property and arrangement of consumer financing.

34.  Fitz-Stephens approached the Kosis and proposed to arrange a refinance loan that would "Get Littman off your back"on or about May 14, 2013.

35.    That Fitz-Stephens attempted to arrange and process a loan application for the Kosis, ran their credit and continued to advise them as a loan broker and a credit repair "expert".

36.    Fitz-Stephens and Windeler remained primarily responsible to the debt owed to the Littman Trust and had an interest in facilitating its payoff. That Fitz-Stephens again represented to the Kosis that he was willing to subordinate his Windeler Straight Note in order to facilitate the refinance of the Littman Trust loan, provided that Fitz-Stephens and his agents would receive the loan broker commission.

37.    That Fitz-Stephens continued to represent the Kosis in their dealings with the Littman Trust and its loan

servicer Evergreen. Fitz-Stephens represented the Kosis to resolve payment, property tax and insurance discrepancies, serving as a professional liaison. As a broker, Fitz-Stephens represented the Kosis in the negotiation of an extension of the Littman Trust balloon payment. While Fitz-Stephens never obtained a loan approval for the Kosis, he arranged a one-year extension of the maturity date of the balloon payments.

38.    On or about May 26, 2014, Littman Trust, Windeler, and the Kosis entered into a <u>Second Amendment to Promissory Note and Deed of Trust</u> (EXHIBIT C), wherein the maturity dates of both the Littman Trust and the Windeler Notes were extended through the month of July 2015. The Kosis made all payments required under this new agreement.

39. Again, Fitz-Stephens arranged, negotiated and drafted the agreement while purporting to serve as broker to both the Littman Trust and the Kosis. Fitz-Stephens again subordinated the Windeler Straight Note.

40.    In April 2015, the Kosis applied for a refinance loan with Infinity Home Loans and was subsequently approved. On July 6, 2015, <u>Kosis obtained an approval for a 30 year 4.375% fixed rate refinance loan</u> for $553,600 from Infinity Home Loans, Inc. ("Infinity").

41.  The refinance loan approved by Infinity was
    conditioned on the subordination of the Windeler note.
    The Kosis were not eligible for a refinance "jumbo" loan
    large enough to pay off both the Littman Trust and
    Windeler debts if full.

42.  On July 7, 2015, following the Kosi's final payment
    contemplated in the Second Amendment to Promissory Note,
    the Littman Trust instructed Evergreen Loan Servicing
    not to accept any additional monthly payments from the
    Kosis; the balloon payment in the amount of $530,000 was
    presumably due by August 1, 2015.

43.  That Fitz-Stephens again promised John Kosi that he
    would agree subordinate the Windeler note. That the
    Kosis relied on Fitzstephen's promise and continued to
    pursue the Infinity refinance loan.

44.  In the 11th hour, Fitz-Stephens seemingly changed his
    mind and intentionally delayed execution of the
    subordination agreement.  Fitz-Stephens informed
    Infinity Home Loans that he needed the permission of his
    client, the Littman Trust before he could agree to
    subordinate and that the Littman Trust had refused to
    provide authorization.

45.  On or about July 16, 2015, Fitz-Stephens demanded that
    the Kosis pursue and FHA loan in the amount of
    $625,000.00 so that Windeler would receive some funds at

closing. Infinity indicated it was unable to approve the Kosis for an FHA loan in the amount of $625,000.00.

46. On or about July 23, Fitz-Stephens demanded that the Kosis pursue and FHA loan in the amount of $625,000.00 through his partnership with Defendant Gordon Hinds, so that they could earn the loan commission instead of Infinity.

47. As a condition to allow the subordination of the Windeler deed of trust, Fitz-Stephens demanded that the Kosis abandon its loan approval with competitor Infinity Home Loans, Inc. just days before the balloon payment to the Littman Trust was due.

48. Fitz-Stephens vehemently promised the Kosis that he and Hinds would arrange a "better" loan than Infinity for a higher amount into to subordinate the remaining $50,000 balance stating: "We are going for 625. You will still owe me 50 plus that we can put on as a second." "We are pulling a case file today and submitting tomorrow. Next is the appraisal. Gordon is going through the file and will ask you for updates".

49. Fitz-Stephens reneged on his previous promises to subordinate and allow the Kosis to pay off the Littman Trust prior to default. The Kosis have repeatedly relied upon Fitz-Stephens representations and his stated expertise in arranging refinance loans and was left with

no other option to avoid defaulting on the Littman Trust loan then to abandon the Infinity Home Loans loan and allow Fitz-Stephens and Hinds to arrange an FHA loan.

50.     Thereafter, Fitz-Stephens and Hinds began processing and arranging the Kosi FHA loan and acting as Mortgage Loan Originators.

51.     On July 27, 2016, Fitz-Stephens wrote: "if you are serious about getting a loan I need copies tomorrow, to pay stubs to W-2s to bank statements to tax returns when can I get them?" John Kosi responded: "I just emailed everything you requested."

52.     When John Kosi followed up on July 29, 2015, neither Fitz-Stephens nor Hinds responded. Thereafter, Kosi missed the deadline for the Littman balloon payment.

53.     When John Kosi followed up on August 5, 2015, Fitz-Stephens responded "I should hear tomorrow. Looks like we will have to get a FHA loan to get the loan amount you need."

54.     Fitz-Stephens advised the Kosis to pay down two credit card accounts in an attempt to increase the Kosi's credit score and that he planned to delay rerunning credit reports until August 17, 2015.

55.     On August 18, 2015, Fitz-Stephens requested credit card information from Kosi to pay for the cost of a

credit report. When Kosi learned that his credit score

increased by 44 points, Fitz-Stephens claimed "that's

what we do." Thereafter, Kosi received loan

"disclosures" from Fitz-Stephens and Hinds and was

instructed to sign them.  Thereafter, Fitz-Stephens

advised the Kosis that he would negotiate another

extension with the Littman trust to allow him and Hinds

more time to arrange the FHA loan.

56.    Fitz-Stephens and Hinds then abandoned the FHA loan

application process and failed to ever obtain a

determination one way or the other as to the approval of

the FHA refinance loan.

Through its broker Fitz-Stephens, Littman Trust agreed
to a Forbearance Agreement, then breached the
Forbearance Agreement when it rejected payments,
instructed Fitz-Stephens to abandon the Kosi refinance
and recorded of a Notice of Default

57. On or about September 8, 2015 Fitz-Stephens and Hinds

informed the Kosis that they had arranged a Forbearance

Agreement (EXHIBIT E) with Littman Trust to buy them

more time to arrange the FHA loan.

58.  Therein Littman agreed to forgo foreclosure until

after October 31, 2015 in exchange for three additional

payments of $2,650.00.

59.  Fitz-Stephens instructed the Kosis to send the

additional mortgage payments provided for in the

forbearance agreement to Evergreen Loan Servicing. Fitz-Stephens and Hinds delayed providing a copy of the Forbearance Agreement until September 24, 2015.

60. Concurrently, on September 8, 2015, Littman Trust agent Bill Burgoyne contacted Evergreen Loan Servicing, advised the loan servicer of the Forbearance Agreement and instructed it to resume acceptance of mortgage payments from the Kosis.

61. The Kosis immediately sent payment pursuant to the Forbearance Agreement and relied on the representation that a Notice of Default would not be filed by Littman Trust so that the FHA refinance could be secured.

62. Evergreen Loan Servicing received payment from the Kosis on September 11, 2015 but returned it with a letter indicating that the "Account has been locked by the seller. We are unable to accept any payments until we have a request from them in writing to remove the lock".

63. The Kosis again sent payment pursuant to the Forbearance Agreement and relied on the representation that a Notice of Default would not be filed by Littman Trust.

64. Again, Evergreen Loan Servicing received payment from the Kosis on September 17, 2015 but returned it with a letter indicating that the "Account has been locked by

the seller. We are unable to accept any payments until we have a request from them in writing to remove the lock"

65. On September 23, 2015, Debtor contacted Evergreen Loan Servicing by phone and was inaccurately informed that no payments have been received, notwithstanding Evergreen's letters to the contrary.

66. On September 24, 2015, Fitz-Stephens provided a copy of the Forbearance Agreement to Debtor which was immediately executed and returned.

67. On September 28, 2015, Debtor contacted Evergreen Loan Servicing by phone and was informed that payments had been received "but the payments are being returned."

68. On or about September 28, 2015, Debtor's spouse contacted Littman Trust agent Terry Littman by phone and was informed by her that "sending payments isn't good enough", that the forbearance agreement would not be honored, that a $31,000.00 "late fee" had been assessed and that a Notice of Default would be recorded.

69. The Kosis continued to try to contact Fitz-Stephens and Hinds regarding the status of the FHA refinance loan; however each abandoned the FHA application and failed to provide a final determination in writing.

70. On or about October 26, 2015, the Littman Trust caused a Notice of Default to be recorded.

71.  At the direction of the Littman Trust, Hinds and Fitz-
Stephens failed to process the Kosi's FHA loan
application.

72.  Hinds and Fitz-Stephens waited until after the Notice
of Default was recorded to arrange "hard money"
refinance loan at double the interest rate for which
Kosi had previously been approved.

73.  On November 4, 2015, Hinds informed John Kosi that the
only loan available was a "hard money" loan at 9.5% with
$22,500.00 down and additional undisclosed broker fees.
After he and Fitz-Stephens caused the foreclosure, Hinds
defended the higher interest rate quoting: "your loan is
in foreclosure and is considered to be in foreclosure
because your lender stopped accepting payments.

### FIRST CAUSE OF ACTION
### OBJECTION TO CLAIM #2
### (Against Defendant "WINDELER")

74.  Plaintiff hereby incorporates by reference the proceeding
paragraphs as if the same were fully set forth.

75.  Debtor hereby objects to Proof of Claim #2 filed by
"Windeler" (EXHIBIT F) and asserts that no evidence of the
debt or of the security interest is provided as required.
Proof of Claim #2 fails to provide itemization or calculation
of the $8,172.78 alleged as "interest due", or of the
$5,943.84 alleged as the amount necessary to cure any default
as of the date of the petition.

76. Plaintiff alleges that Windeler is the alter ego of Robert Fitz-Stephens. That Fitz-Stephens is the sole shareholder and officer of Windeler. That Fitz-Stephens uses the assets of Windeler as his own, for personal use. That there exists such unity of interest and ownership that the separate personalities of Windeler and Robert Fitz-Stephens no longer exist.

77. That the acts herein alleged are treated as those of the Windeler corporation and Fitz-Stephens alone, it would sanction a fraud or promote injustice to uphold the corporate entity and allow the sole shareholder Fitz-Stephens to escape personal liability for the debt.

78. That any claim asserted by Windeler is subject to a right to set off for any remedies due to debtor for damages caused by Robert Fitz-Stephens, individually and in his capacity as an officer of and Windeler.

79. The filing of a Proof of Claim establishes the prima facie validity of a claim [see FRBP 3001(f)] unless it is overcome by evidence establishing a bona fide dispute concerning the validity of the claim. Once the prima facie validity is overcome, the ultimate burden of proof shifts to the claimholder. *In re Lundell,* 223 F.3d 1035, 1039 (9th Cir. 2000).

80. Section 501 of Title 11 of the United States Code allows creditors a means to present their claims against a debtor to the bankruptcy court by filing a proof of claim. See 11 U.S.C. S 501. Whether such a claim for which a proper proof has been filed is "allowable" is a matter for determination pursuant to 11 U.S.C. S 502 and the procedural rules governing the

bankruptcy courts. These rules and our case law have put in a place a general procedure to allocate the burdens of proof and persuasion in determining whether a claim is allowable.

81. A proof of claim is deemed allowed unless a party in interest objects under 11 U.S.C. S 502(a) and constitutes "prima facie evidence of the validity and amount of the claim" pursuant to Bankruptcy Rule 3001(f). See also Fed. R. Bankr. P. 3007. The filing of an objection to a proof of claim "creates a dispute which is a contested matter" within the meaning of Bankruptcy Rule 9014 and must be resolved after notice and opportunity for hearing upon a motion for relief. See Adv. Comm. Notes to Fed. R. Bankr. P. 9014.

82. Rule 3001 requires that a claim be supported by evidence and copy of the writing supporting the claim be attached. Here, no writings are attached. In addition to its principal amount, where a claim includes interest, fees, expenses, or other charges incurred before the petition was filed, an itemized statement of the interest, fees, expenses, or charges shall be filed with the proof of claim.

83. That Proof of Claim #2 fails to provide *any* supporting documentation evidencing the debt of the security interest.


**SECOND CAUSE OF ACTION**
**NEGLIGENCE PER SE**

84. Plaintiff hereby incorporates by reference the proceeding paragraphs as if the same were fully set forth.

85. That at all times relevant Fitz-Stephens and Hinds were agents of Plaintiff, including but not limited to in the

capacity as Brokers licensed by the California Bureau of Real Estate.

86. That Fitz-Stephens and Hinds are each obligated to comply with provisions of the California Financial Code and the SAFE Act and owed Plaintiff fiduciary duties

87. Fitz-Stephens and Hinds violated provisions of the California Financial Code and the SAFE Act and said violations were a substantial factor in causing harm to Plaintiff

88. Fitz-Stephens and Hinds owed fiduciary duties to Plaintiff but failed to use reasonable care to prevent harm to Plaintiff.

89. That Fitz-Stephens and Hinds had superior capacity, knowledge, and experience in the area of consumer residential lending greater than Plaintiff and her husband.

90. That all Defendants are responsible for representations made directly to Plaintiff's husband John Kosi and intended and reasonably expected those representations would be repeated to Plaintiff.

91. That at all times relevant Fitz-Stephens and Hinds were acting in the capacity as dual agents for the Littman Trust including but not limited to in the capacity as Brokers licensed by the California Bureau of Real Estate. That Littman Trust duly authorized Fitz-Stephens and Hinds to act on its behalf. As such, the Littman Trust is vicariously liable and therefore responsible for the harm to Plaintiff caused by Fitz-Stephens and Hinds.

92.  That at all times relevant Fitz-Stephens and Hinds were acting in a capacity as dual agents of Windeler, including but not limited to in the capacity as Brokers licensed by the California Bureau of Real Estate. That Windeler duly authorized Fitz-Stephens and Hinds to act on its behalf. As such, the Windeler is vicariously liable and therefore responsible for the harm to Plaintiff caused by Fitz-Stephens and Hinds.

93.  That Fitz-Stephens and Hinds were partners in the business of arranging consumer residential mortgages when they caused Plaintiff harm and are subject to the provisions of the California Financial Code and the SAFE Act.  That Fitz-Stephens and Hinds authorized each other to act on their mutual behalf when they caused Plaintiff harm.

94.  That Fitz-Stephens and Hinds were acting in their capacity as agents of Plaintiff, Windeler and the Littman Trust when they caused Plaintiff harm.

95.  By inducing the Kosis into abandoning the approved Infinity loan, Hinds and Fitz-Stephens prevented the Kosi's from avoiding foreclosure.

96.  By delaying processing of the Kosis' FHA loan application, Fitz-Stephens and Hinds prevented the Kosi's from avoiding foreclosure.

97.  By abandoning Kosis' FHA loan application, Fitz-Stephens and Hinds sought to compel the Kosis into accepting a high interest, unaffordable hard money loan and prevent the Kosis from avoiding foreclosure.

98.  By attempting to represent themselves, the Littman
     Trust, Windeler and the Kosi family, Fitz-Stephens and
     Hinds engaged in a conflict of interest that resulted in
     harm to Plaintiff.

99.  That Fitz-Stephens and Hinds actions and omissions
     prevented the debtor from obtaining a refinance loan,
     allowed the wrongful foreclosure by the Littman Trust to
     be initiated and necessitated the filing of this chapter
     13 to prevent further loss of equity.


### THIRD CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION

100. Plaintiff hereby incorporates by reference the proceeding
     paragraphs as if the same were fully set forth.

101. Fitz-Stephens and Hinds negligently misrepresented important
     facts to Plaintiff and her husband including, but not limited
     to:   that Fitz-Stephens would agree to subordinate the
     Windeler note and allow payoff of the Littman loan prior to
     its default; that Fitz-Stephens and Hinds would provide a
     "better loan" then the approved Infinity loan; that Plaintiff
     was eligible for an FHA loan at $625,000; that Fitz-Stephens
     and Hinds would work diligently to process and obtain approval
     of Plaintiff's FHA loan application; that Fitz-Stephens and
     Hinds had unique influence over the Littman Trust; that Fitz-
     Stephens and Hinds had negotiated Forbearance Agreement to
     extend the time needed for them to complete the FHA refinance

and that the final FHA loan would not have an interest rate in
excess of 5.5%.

102. Fitz-Stephens and Hinds stood in a fiduciary or similar
relation of trust and confidence to Plaintiff and her husband.

103. Fitz-Stephens and Hinds successfully endeavored to secure
the confidence of the recipient.

104. That Fitz-Stephens and Hinds secured had a relationship of
trust and confidence with Plaintiff and her husband.

105. That Fitz-Stephens and Hinds opinions were each declared the
matter to be true and are considered representations of fact
because Fitz-Stephens and Hinds claimed to have special
knowledge about the consumer mortgage financing not possessed
by Plaintiff or her husband.

106. None of the aforementioned representations made by Fitz-
Stephens and\or Hinds were true.

107. That Fitz-Stephens and Hinds had no reasonable grounds for
believing theses representation was true when they made them
to Plaintiff and her husband.

108. That Fitz-Stephens and Hinds intended that Plaintiff and her
husband rely on these representations.

109. That Plaintiff and her husband reasonably relied on Fitz-
Stephens and Hinds' representations;

110. That Plaintiff was harmed.

111. That Plaintiff's reliance on Fitz-Stephens and Hinds'
representations were a substantial factor in causing Plaintiff
harm.

## FOURTH CAUSE OF ACTION
### BREACH OF CONTRACTS
### (Against "LITTMAN TRUST" "WINDELER and "FITZ-STEPHENS")

112. Plaintiff hereby incorporates by reference the proceeding paragraphs as if the same were fully set forth.

113. Plaintiff claims that she and her husband entered into a contract with Windeler and its alter ego, Fitz-Stephens (Straight Note-EXHIBIT C).

114. That said contract included the provision that Fitz-Stephens would always allow the subordination of the note so as to allow a refinance and full payment of the Littman Trust note. Evidence of this term is provided by representations made by Fitz-Stephens and the actions of the parties reflected in previous agreements to allow subordination.

115. Plaintiff claims that she and her husband entered into a contract with the Littman Trust (Forbearance Agreement-EXHIBIT E) for the delay of foreclosure pending completion of the FHA refinance loan arranged by Littman Trust agents Fitz-Stephens and Hinds.

116. That the parties understood and agreed to the terms of these agreements; and the parties agreed to be bound before a written agreement was completed and signed.

117. That the terms of the Forbearance Agreement are clear enough that the parties can understand what each was required to do:

118. As to the Windeler contract, Fitz-Stephens was obligated to allow full subordination of the Junior note so that plaintiff could pay off the Littman Trust note and avoid default and foreclosure. That a reasonable person would conclude, from

the words, conduct and writing of each party, that there was an agreement to allow subordination.

119. As to the Littman Forbearance Agreement, the debtor was obligated to pay payments which were tendered and wrongfully rejected by Littman Trust's loan servicing agent, Evergreen Loan Servicing and by agent Terry Littman. The Plaintiff was excused from performance after Littman Trust twice refused to accept payment. That a reasonable person would conclude, from the words, conduct in writing of each party, that there was an agreement.

120. The Littman Trust was obligated to accept those payments and delay initiation of a non-judicial foreclosure so as to allow the Debtor the opportunity to complete the refinance process.

121. The Littman Trust refused to accept payment provided for in the agreement, prevented Debtor from establishing a mortgage payment history and prematurely initiated foreclosure. Each of these acts contributed to Debtor's inability to obtain conventional financing and necessitated this chapter 13. As such Debtor was harmed by Littman Trust's failure to perform its obligations under the Forbearance Agreement.

122. That Debtor made a good faith effort to comply with each contract; and that both Littman Trust and Windeler received essentially what their respective contracts called for because Debtor's failures, if any, were so trivial or unimportant that they could have been easily fixed or prevented by Defendants.

123. That the breach of the Straight Note and the subsequent breach Forbearance Agreement was a substantial cause of the

harm suffered by Debtor, including, but not limited to the loss of the opportunity to obtain conventional financing, the wrongful imposition of a $30,000 late fee, the negative credit effects of a wrongful foreclosure, Chapter 13 Trustee fees and other consequences associated with the filing of this bankruptcy case.

**FIFTH CAUSE OF ACTION**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Against "LITTMAN TRUST" "WINDELER and "FITZ-STEPHENS")**

124. Plaintiff hereby incorporates by reference the proceeding paragraphs as if the same were fully set forth.

125. In every contract or agreement there is an implied promise of good faith and fair dealing. This means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract; however, the implied promise of good faith and fair dealing cannot create obligations that are inconsistent with the terms of the contract.

126. Plaintiff claims that Defendants Littman Trust, Windeler and its alter ego of Fitz-Stephens violated the duty to act fairly and in good faith in their respective contracts (the Straight Note and the Forbearance Agreement)

127. That Plaintiff entered into a Straight Note contracts with Windeler and its alter ego of Fitz-Stephens.

128. That Plaintiff entered into contracts with Littman Trust and Windeler, including the Forbearance Agreement.

129. That Plaintiff did all, or substantially all of the significant things that the contracts required her to do or that she was excused from having to do those things].

130. That all conditions required for each of the Defendants' performance had occurred or was excused and that Defendants unfairly interfered with Plaintiff's right to receive the benefits of those contracts.

131. That Plaintiff was harmed by those Defendants' conduct. That the breach of the Straight Note and Defendants collective refusal to allow subordination so that Plaintiff could complete her Infinity Home Loan approved refinance and pay off the Littman Trust debt was a substantial cause of the harm suffered by Debtor.

132. Subsequently, the breach of the Forbearance Agreement and Defendants collective refusal to honor the forbearance contract and postpone foreclosure was a substantial cause of the harm suffered by Debtor.

133. Finally, the collusion between agents of the Defendants, obvious conflicts of interests and pursuit of self-interest prevented Plaintiff from receiving the benefit of these contracts and constitutes a substantial cause of the harm suffered by Plaintiff including, but not limited to, the loss of the opportunity to obtain conventional financing, the wrongful imposition of an estimated $30,000 late fee, the negative credit effects of a wrongful foreclosure, Chapter 13 Trustee fees and other consequences associated with the filing of this bankruptcy case.

## PRAYER

Plaintiff and her family are in the process of selling the Property pursuant to a bankruptcy plan of reorganization. At issue is the amount of debt, if any Littman Trust and Windeler in light of the setoffs to which Plaintiff is entitled.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1) For compensatory damages according to the proof;
2) For general damages in tort according to the proof
3) For special damages according to the proof;
4) For reasonable attorney fees and costs incurred in this action, according to the proof;
5) For costs of suit incurred herein;
6) For such other and further relief as the Court deems just and proper.

Respectfully submitted,

June 15, 2016

By: _____

Law Office of J. Arthur Roberts
Joseph Arthur Roberts, Esq.
Attorney for Plaintiffs
Diana L. Kosi